IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMY E.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LELAND DUDEK, Acting | : | NO.  23-1841 |
| Commissioner of Social Security[2] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                              March 11, 2025

Plaintiff seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed applications for DIB and SSI on October 23, 2020, alleging disability from September 28, 2020, as a result of systolic heart failure,

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her first name and last initial. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Leland Dudek became Acting Commissioner of Social Security on or about February 17, 2025, upon the resignation of Acting Commissioner Michelle King. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Dudek should be substituted as the defendant in this case. No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

hypothyroidism, high blood pressure, and high cholesterol.  Tr. at 226, 230, 262, 278.[3]

Her applications were denied initially, id. at 53-67, 70-86, and on reconsideration, id. at

87-104, 105-22, and she requested an administrative hearing.  Id. at 148-49.  After

holding a hearing on October 5, 2021, id. at 33-52, the ALJ issued an unfavorable

decision on October 20, 2021.  Id. at 13-25.  The Appeals Council denied Plaintiff's

request for review on March 23, 2023, id. at 1-4, making the ALJ's October 20, 2021

decision the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

Plaintiff sought review in the federal court on May 16, 2023, Doc. 1, and the matter is

now fully briefed and ripe for review.  Docs. 10, 13-14.[4]

## II.   **LEGAL STANDARD**

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

---

[3]For purposes of SSI, the earliest month for which benefits can be paid "is the month following the month [the claimant] filed the application," if the claimant meets all the other requirements for eligibility.  See 20 C.F.R. § 416.335.  To be entitled to DIB, Plaintiff must establish that he became disabled on or before his date last insured.  20 C.F.R. § 404.131(b).  The Certified Earning Record indicates and the ALJ found that Plaintiff was insured through March 2024.  Tr. at 15, 242.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 8.

scintilla." Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97,

103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.

Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months." 42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

> 5.      If the claimant cannot perform her past work,
> then the final step is to determine whether there is other work
> in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In her October 20, 2021 decision, the ALJ found at step one that Plaintiff has not

engaged in substantial gainful activity since September 28, 2020, her alleged onset date.

Tr. at 15.  At step two, the ALJ found that Plaintiff suffers from the severe impairments

of congestive heart failure, coronary artery disease, and cardiomyopathy, and non-severe

impairments including thyroid disorder, obesity, hypertension, and hyperlipidemia.  Id. at

16.  At step three, the ALJ found that Plaintiff does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the

Listings.  Id. at 17.

The ALJ determined that Plaintiff retains the RFC to perform light work, but

limited to occasional climbing ramps and stairs; never climbing ladders, ropes, or

scaffolds; occasional stooping, kneeling, crouching, and crawling; frequent exposure to

extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation;

and no exposure to hazards.  Tr. at 17.  The ALJ found that Plaintiff could perform her past relevant work as an office clerk.  Id. at 23. As a result, the ALJ concluded that Plaintiff is not disabled.  Id. at 24.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly discounted the opinions of the state agency medical consultants and treating sources.  Docs. 10 & 14.  Defendant responds that the ALJ's evaluation of the opinion evidence is supported by substantial evidence.  Doc. 13.

### B.    Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on July 7, 1960, and thus was 60 years of age on her alleged DIB onset date (September 28, 2020) and when she applied for SSI (October 23, 2020), and 61 years of age at the time of the ALJ's decision (October 20, 2021).  Tr. at 226, 258. She graduated from high school and received no specialized training, id. at 36, 263, and has prior work as an office clerk.  Id. at 263, 321.[5]

At the administrative hearing, Plaintiff testified that she is unable to work due to her heart condition and medication side effects, including headaches, nausea, and constipation, as well as episodes of low blood pressure.  Tr. at 38-39.  She experiences headaches once or twice per week that require her to go into a dark room and lie down. Id. at 44-45.  She estimated that she could sit at one time for half an hour, stand for 5 -to-10 minutes at a time, and walk about half a block, id. at 39-40, and that she could climb about 6 steps before needing to stop to catch her breath.  Id. at 46.  Plaintiff stated that

---

[5]Plaintiff's office job consisted of conducting telephonic surveys and sorting and entering incoming mail, tr. at 36-37, which the vocational expert ("VE") characterized as "within the occupational category of office clerk."  Id. at 49.

she has used a walker since before she had heart surgery due to leg swelling, id. at 41, and that she relies on it when she experiences shortness of breath.  Id. at 47.

Plaintiff reported that she lives alone in a two-story home and that she sleeps on the first floor.  Tr. at 41-42, 46, 270.  She does not drive and is reliant on her son to take her places and to do her laundry, cooking, and cleaning.  Id. at 41-42.  Plaintiff needs help getting in and out of the bathtub.  Id. at 42.  On a typical day she takes medication, eats, measures her blood pressure and weight, and takes a walk.  Id. at 271.[6]

A VE also testified at the administrative hearing.  Tr. at 48-51.  The VE characterized Plaintiff's past work as an office clerk as light and semiskilled, both as defined and as performed by Plaintiff.  Id. at 49.  Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC assessment, see supra at 4-5, the VE testified that such an individual could perform Plaintiff's past work.  Id. at 49.  If the hypothetical individual were limited to sedentary work, the VE testified that Plaintiff's past work would be excluded.  Id.  Similarly, Plaintiff's past work would be excluded if the individual required a walker for ambulation, missed two days per month on a consistent basis, or was off task for 15% of the workday.  Id. at 49-50.

### C.    <u>Medical Evidence Summary</u>

On August 6, 2020, several weeks prior to her alleged onset date, Plaintiff saw her primary medical provider, Rachel Fan, M.D., with complaints of nighttime breathing

---

[6]The record contains two Function Reports completed by Plaintiff, dated December 1, 2020 (tr. at 270-77) and April 19, 2021 (id. at 288-95).  These reports are largely consistent with Plaintiff's testimony, except she indicated in the first report that she prepares "complete meals" on a daily basis, does laundry twice per week, performs some cleaning daily, and goes shopping once per week. Id. at 272-73.

issues. Tr. at 545. Plaintiff also reported shortness of breath, particularly in hot weather, and that she limits her walking. Id. at 546. Examination showed elevated blood pressure and diminished breath sounds bilaterally with slight end inspiratory crackles at the right lung base. Id. at 547. Additional testing revealed severely elevated thyroid stimulating hormone levels and ischemic heart disease, and Dr. Fan recommended evaluation at an emergency room. Id. at 543-44.

A chest x-ray performed on August 7, 2020, revealed mild interstitial changes that could represent early edema. Tr. at 740. A transesophageal echocardiogram ("echo") performed on August 11, 2020, revealed moderately increased left ventricular size, left ventricular ejection fraction of 20-25%, moderately increased left atrial size, elevated left ventricular filling pressures, severe mitral regurgitation, and moderate to severe tricuspid regurgitation. Id. at 455.[7] On the same day, cardiology office records indicate that Plaintiff initiated follow-up care, reporting a diagnosis of heart failure, reduced ventricular ejection fraction, global hypokinesis, and concern for cardiac complications of severe hyperthyroidism. Tr. at 539-40.[8]

---

[7]Cardiac-related regurgitation refers to the backward flowing of blood into the heart or between heart chambers. Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1621. According to the American College of Cardiology, the normal range for a left ventricular ejection fraction is 50-70%. See Ateet Kosaraju, Amandeep Goyal, Yulia Grigorova & Amgad N. Makaryus, Left Ventricular Ejection Fraction, April 24, 2023, https://www.ncbi.nlm.nih.gov/books/NBK459131/ (last visited Feb. 18, 2025). The ejection fraction is a measure of the volume ejected in relation to the volume of blood in the ventricle. Id.

[8]Hypokinesis is abnormally decreased mobility. DIMD at 903. Hyperthyroidism is a condition caused by excessive production of thyroid hormones, with characteristics including, among other things, irregular heartbeats, abnormal pulse pressure, palpitations, and fatigability. Id. at 897.

On August 13, 2020, Plaintiff saw cardiologist Mark Etter, M.D., for an evaluation of her newly diagnosed cardiomyopathy and severe mitral regurgitation, as well as complaints of worsening exertional dyspnea and fatigue.  Tr. at 521.[9]  Upon examination, Dr. Etter noted a 3/6 systolic murmur at the left sternal border consistent with mitral regurgitation.  Id. at 522.  The doctor discussed with Plaintiff that she might need to undergo a cardiac catheterization.  Id. at 521.  Dr. Etter listed Plaintiff's medications as aspirin, carvedilol, levothyroxine, liothyronine, and lisinopril, id. at 522, and started Plaintiff on spironolactone for leg swelling.  See id. at 527.[10]

On September 28, 2020, Plaintiff was hospitalized after presenting to the Lancaster General Hospital emergency room ("Lancaster General ER") with complaints of swelling in the lower extremities, which caused pain with weight bearing and shortness of breath at times.  Tr. at 385.  Plaintiff reported that she ceased spironolactone because it worsened her swelling.  Id.  Attending physicians started Plaintiff on Lasix infusion, id. at

---

[9]Cardiomyopathy refers to non-inflammatory disease of the heart.  DIMD at 294. Dyspnea is shortness of breath.  Id. at 582.

[10]Carvedilol (Coreg) is used to treat heart failure and hypertension.  See https://www.drugs.com/carvedilol.html (last visited Feb. 18, 2025).  Levothyroxine is used to treat hypothyroidism (low thyroid activity). See https://www.drugs.com/levoxthyroxine.html (last visited Feb. 18, 2025).  Liothyronine (Cytolmel) is also used to treat hypothyroidism.  See https://www.drugs.com/liothyronine.html (last visited Feb. 18, 2025).  Lisinopril is used to treat hypertension.  See https://www.drugs.com/lisinopril.html (last visited Feb. 18, 2025).  Spironolactone (marketed as Aldactone) is a diuretic used to treat heart failure and hypertension.  See https://www.drugs.com/spironolactone.html (last visited Feb. 18, 2025).

386,[11] and performed testing.  A cardiac catheterization revealed severe ischemic cardiomyopathy (ICM) with microvascular disease and severe mitral regurgitation.  Id. at 659.  An MRI performed on October 2, 2020, revealed Plaintiff's left ventricular ejection fraction at 14%, as well as severely reduced right ventricular ejection fraction.  Id. at 486.  On October 8, 2020, Plaintiff underwent percutaneous coronary interventions (PCIs) of the left anterior descending and left circumflex arteries.  Id. at 489-90, 586.[12]  Plaintiff was discharged from the hospital on October 12, 2020, with instructions to pursue medical therapy and to follow-up with cardiology.  Id. at 510-11.  The attending physician stopped lisinopril and listed Plaintiff's relevant medications at discharge as losartan, Aldactone, Coreg, Plavix, and atorvastatin.  Id. at 512.[13]

On October 20, 2020, Plaintiff followed up with Kathleen Nissley, CRNP, at The Heart Group of Lancaster General Health.  Tr. at 355.  Plaintiff reported no weight gain, mild edema in her feet, some fatigue, and that she could climb a flight of steps without

---

[11]Lasix (generic furosemide) treats edema (fluid retention) in people with congestive heart failure, and is also used to treat hypertension.  See https://www.drugs.com/lasix.html (last visited Feb. 18, 2025).

[12]PCI, also known as angioplasty, is a minimally invasive procedure in which stents are put in place to open blocked coronary arteries.  See https://www.my.clevelandclinic.org/health/treatments/22066-percutaneous-coronary-intervention (last visited Feb. 18, 2025).

[13]Losartan is used to treat hypertension and to decrease the risk of stroke in people who have hypertension and left ventricular hypertrophy (enlargement of the walls of the left side of the heart).  See https://www.drugs.com/losartan.html (last visited Feb. 18, 2025).  Plavix (generic clopidogrel) is used to prevent blood platelets from sticking together and is used to lower the risk of a stroke, blood clot, or serious heart problem following a heart attack.  See https://www.drugs.com/plavix.html (last visited Feb. 18, 2025).  Atorvastatin (marketed as Lipitor) is used to lower cholesterol and triglycerides.  See https://www.drugs.com/artovastatin.html (last visited Feb. 18, 2025).

dyspnea. Id. at 356. She denied chest pain, palpations, dizziness, or syncope, and reported that she was tolerating her medications. Id. She had a life vest for prevention of sudden cardiac death. Id. Upon examination, Ms. Nissley observed that Plaintiff had mild edema of the lower legs, no chest pain, normal heart rate and rhythm, and normal breath sounds and effort, with no wheezes or rales. Id. Ms. Nissley diagnosed Plaintiff with chronic biventricular systolic heart failure, continued her on Coreg and spironolactone, and increased her dose of losartan. Id.

On November 3, 2020, Plaintiff presented to Lancaster General ER with complaints of bloody stool and diarrhea, generalized weakness, and dizziness with ambulation. Tr. at 863, 1448, 1454. The attending treatment provider noted that Plaintiff wore a life vest and denied any chest pressure or shortness of breath. Id. at 1448. Examination showed Plaintiff to be slightly tachycardic, with normal breathing, low systolic blood pressure, and no edema. Id. at 1450. Plaintiff was admitted and received three units of packed red blood cells for a likely gastrointestinal bleed. Id. at 860, 927. Testing included an electrocardiogram, which revealed a left bundle branch block, and a chest x-ray which showed cardiomegaly. Id. at 865, 868.[14] During a follow-up with Dr. Fan on November 10, 2020, Plaintiff reported doing well, with no recurrent bleeding, id. at 861, and stated that she always wears a life vest except when showering. Id. at 860. Dr. Fan discontinued Plavix. Id.

Plaintiff reported no complaints during follow-up appointments in January and February 2021, with mostly normal examination findings except for elevated blood

---

[14]Cardiomegaly refers to abnormal enlargement of the heart. DIMD at 294.

pressure following the recent death of her daughter's father.  Tr. at 1038, 1056.  A February 9, 2021 echo revealed mildly increased left ventricular wall thickness, left ventricular ejection fraction of 35-40%, grade II diastolic dysfunction, and left ventricular wall motion abnormality.  Id. at 1072-73, 1156.  Also in February, Plaintiff's gastroenterologist's office referred her for cardiac clearance for esophagogastroduodenoscopy ("EGD") and colonoscopy procedures.  Id. at 1054.[15]

On February 12, 2021, State agency reviewer Kevin Scott Hollick, D.O., reviewed Plaintiff's medical records and completed a functional assessment as part of the Initial Determination.  Tr. at 59-69, 76-83.  Dr. Hollick opined that Plaintiff could frequently lift/carry 10 pounds, stand and/or walk for a total of 2 hours and sit for 6 hours in an 8-hour workday, and should avoid concentrated exposure to extreme cold, extreme heat, and humidity, id. at 62-64, 79-80, and determined that she was not disabled.  Id. at 68, 85.  Specifically, Dr. Hollick determined that Plaintiff retained the RFC to perform her past relevant work, which he characterized as a "telephone interviewer."  Id. at 67, 84.

On March 17, 2021, during a cardiology follow-up, Plaintiff reported feeling well and denied increased dyspnea on exertion, orthopnea,[16] swelling, wheezing, nocturnal cough, dizziness, lightheadedness, or increased fatigue.  Tr. at 1105.  Also in March 2021, Plaintiff obtained cardiac clearance for the gastrointestinal procedures.  Id. at 1104.

---

[15]EGD is endoscopic examination of the esophagus, stomach, and duodenum. DIMD at 648.

[16]Orthopnea is shortness of breath relieved by assuming an upright position. DIMD at 1338.

On March 23, 2021, Dr. Fan completed a medical source statement regarding Plaintiff's physical conditions. Tr. at 1094-97.  The doctor stated that she had treated Plaintiff for 7 months for diagnoses of chronic systolic heart failure, hypothyroidism, ischemic dilated cardiomyopathy, symptomatic anemia, coronary artery disease, hypertension, hyperlipidemia, obesity, and prediabetes, and that her conditions would be expected to last longer than 12 months. Id. at 1094.  Dr. Fan opined that since August 6, 2020, Plaintiff would be off task over 25% of the workday and be absent more than 4 days per month as a result of her impairments and/or treatment. Id.  The doctor further opined that Plaintiff could never lift/carry over 10 pounds, rarely lift/carry less than 10 pounds, sit for 4 hours and stand/walk 1 hour total in an 8-hour workday, and required the option to sit/stand at will due to severe systolic heart failure with an ejection fraction of 35-40%, coronary artery disease, and exertional dyspnea limiting heavy lifting and carrying and prolonged standing and walking. Id. at 1095.  Dr. Fan indicated that Plaintiff could occasionally use her upper extremities for fine and gross manipulation, explaining that she could not complete prolonged exertion of any kind due to severe cardiac disease, id. at 1096, and that she could occasionally operate foot controls and never perform any postural maneuvers because severe cardiac disease limits her ability to perform prolonged exertional or postural activities. Id. at 1096-97.  Finally, Plaintiff could tolerate rare exposure to humidity and wetness and no exposure to unprotected heights, moving mechanical parts, operating a vehicle, dust, odors, fumes, pulmonary irritants, extreme cold/heat, and vibrations. Id. at 1097.

On April 20, 2021, Plaintiff had a cardiology follow-up with Leah Seitz, CRNP, and denied chest pain. <u>Tr.</u> at 1156. Examination findings, including cardiac and pulmonary findings, were normal. <u>Id.</u> at 1159-60. Ms. Seitz continued Plaintiff's medications including losartan, Coreg, aldactone, Imdur, and hydralazine, and started Jardiance. <u>Id.</u> at 1157.[17]

On April 21, 2021, Ms. Seitz completed a treating source statement regarding Plaintiff's physical conditions. <u>Tr.</u> at 1139-42.[18] Ms. Seitz indicated that she had treated Plaintiff since January 2021 for chronic systolic heart failure, mixed ischemic and non-ischemic cardiomyopathy, right ventricular dysfunction, and coronary artery disease status post-PCI. <u>Id.</u> at 1139. Ms. Seitz opined that Plaintiff would be off task 5% of the workday, could maintain attention and concentration less than 1-hour before requiring a break, and would be absent 1 -to- 2 days per month. <u>Id.</u> She could occasionally lift/carry 10 pounds, sit 8 hours, and stand/walk 2 -to- 3 hours total in an 8-hour workday with a sit/stand at will option due to significant cardiomyopathy and coronary disease. <u>Id.</u> at 1140. She could occasionally operate foot controls and climb ramps/stairs, never climb ladders/scaffolds, and rarely balance, stoop, kneel, crouch, or crawl. <u>Id.</u> at 1141-42. She

---

[17]Imdur is a nitrate that widens blood vessels, making it easier for blood to flow and for the hear to pump. <u>See</u> https://www.drugs.com/imdur.html (last visited Feb. 18, 2025). Hydralazine is used to treat hypertension. <u>See</u> https://www.drugs.com/hydralazine.html (last visited Feb. 18, 2025). Jardiance (generic empagliflozin) is used to help control blood sugar levels and to reduce the risk of cardiovascular problems in adults with heart failure or cardiovascular disease with type 2 diabetes. <u>See</u> https://www.drugs.com/jardiance.html (last visited Feb. 18, 2025).

[18]Because Plaintiff's claim focuses on the ALJ's consideration of the opinion evidence related to Plaintiff's physical impairments, I will not summarize Ms. Seitz's assessment of Plaintiff's mental health limitations. <u>See tr.</u> at 1144-48.

could tolerate occasional exposure to humidity and wetness, rare exposure to vibrations, and no exposure to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, and extreme cold/heat.  Id. at 1142.

On May 3, 2021, at the reconsideration level of review, State agency medical consultant Michael J. Brown, D.O., concurred with Dr. Hollick's assessment, except that Plaintiff should avoid exposure only to hazards such as machinery and heights.  Tr. at 97-99, 115-17.  Dr. Brown agreed with Dr. Hollick's determination that Plaintiff could perform her past work.  Id. at 102-03, 120-21.

On July 9, 2021, Plaintiff followed up with Dr. Fan and reported that her blood pressure had been low the day before.  Tr. at 1720.  Plaintiff stated that she was "[f]eeling completely well," with no lightheadedness, dizziness, orthostasis, chest pain or shortness of breath, and no swelling.  Id.  Upon examination, Plaintiff appeared hypotensive, with a blood pressure of 80/48 on the left arm and 96/58 on the right arm.  Id.  Dr. Fan opined that the blood pressure readings were likely caused by Plaintiff's multiple antihypertensive medications, and advised her to reduce hydralazine.  Id. at 1719.  Dr. Fan continued to diagnose Plaintiff with chronic systolic congestive heart failure, ischemic dilated cardiomyopathy, and hypotension, id., and given Plaintiff's "complex situation," Dr. Fan advised Plaintiff to consult with her cardiologist.  Id.

On July 28, 2021, Alison Pasierb, CRNP, completed a treating source statement regarding Plaintiff's physical conditions.  Tr. at 1189-92.  Ms. Pasierb indicated that she began treating Plaintiff that day for chronic systolic heart failure, mixed ischemic and non-ischemic cardiomyopathy, and coronary artery disease status-post PCI.  Id. at 1189.

14

Ms. Pasierb opined that Plaintiff would be off task 5% of the workday, could maintain attention and concentration less than 1 hour at a time, and would be absent 1 -to-2 days per month.  Id.  She could occasionally lift and/or carry 10 pounds, and in an 8-hour workday she could sit for 8 hours and stand/walk for 2 -to- 3 hours total with a sit/stand at will option due to "significant cardiomyopathy and coronary disease."  Id. at 1190. She did not need a cane or other assistive device.  Id. at 1191.  Plaintiff could occasionally operate foot controls and climb ramps/stairs, never climb ladders or scaffolds, and rarely balance, stoop, kneel, crouch, or crawl.  Id. at 1191-92.  She could tolerate occasional exposure to humidity and wetness, rare exposure to vibrations, and no exposure to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, and extreme cold/heat.  Id.

On August 19, 2021, Dr. Fan completed a second treating source statement.  Tr. at 1629-32.  Dr. Fan opined that Plaintiff would be off task 10% of the workday, could maintain attention and concentration less than 1 hour at a time, and would be absent more than 4 days per month due to chronic heart failure and cardiomyopathy.  Id. at 1629-30. The doctor further opined that Plaintiff could occasionally lift and/or carry up to 10 pounds, citing Plaintiff's "significant cardiac disease."  Id. at 1630.  Plaintiff could stand/walk for 2 -to- 3 hours total in an 8-hour workday, and required the ability to sit/stand at will.  Id.[19]  She could occasionally operate foot controls and perform fine and gross manipulation with the bilateral upper extremities, as her exertion was limited by

---

[19]Dr. Fan did not provide any opinion regarding the total hours that Plaintiff could sit in an 8-hour workday.  Tr. at 1630.

significant cardiac disease.  Id. at 1631.  She could occasionally rotate her head and/or neck, rarely balance, stoop, kneel, and crouch, and never crawl.  Id. at 1631.  Finally, Dr. Fan opined that Plaintiff could rarely tolerate exposure to dust, odors, fumes, and pulmonary irritants, could rarely operate a vehicle, and should never be exposed to extreme heat or cold.  Id. at 1632.

Also on August 19, 2021, gastroenterologist Melissa Morgan, D.O., completed a medical source opinion based on her treatment of Plaintiff's acute blood loss anemia.  Tr. at 1637-40.  Dr. Morgan opined that Plaintiff could sit, stand, and walk for 8 hours each total in an 8-hour workday; required a sit-stand option; did not need a cane or assistive device; and would not miss work or be off task due to her conditions.  Id. at 1637-39. The doctor noted that she was unable to assess Plaintiff's use of her hands, postural activities, and environmental limitations.  Id. at 1637, 1639.

### D.    Plaintiff's Claim

Plaintiff argues that that the ALJ failed to properly evaluate the medical source opinions, resulting in a flawed RFC assessment and erroneous step four determination. Doc. 10 at 8-11; Doc. 14 at 1-7.  Defendant counters that the ALJ's consideration of the medical opinion evidence and RFC assessment are supported by substantial evidence. Doc. 13 at 5-9.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or

> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. §§ 404.1520c(a); 416.920c(a).[20]  The regulations list the factors to be utilized

in considering medical opinions:  supportability, consistency, treatment relationship

including the length and purpose of the treatment and frequency of examinations,

specialization, and other factors including familiarity with other evidence in the record or

an understanding of the disability program.  Id. §§ 404.1520c(c), 416.920c(c).  The most

important of these factors are supportability and consistency, and the regulations require

the ALJ to explain these factors, but do not require discussion of the others.  Id.

§§ 404.1520c(b)(2), 416.920c(b)(2).  The regulations explain that "[t]he more relevant

the objective medical evidence and supporting explanations presented by a medical

source are to support his or her medical opinion(s) . . . , the more persuasive the medical

opinions . . . will be."  Id. §§ 404.1520c(c)(1), 416.920c(c)(1).  Similarly, "[t]he more

consistent a medical opinion(s) . . .  is with the evidence from other medical sources and

nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id.

§§ 404.1520c(c)(2), 416c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must

consider all the evidence and give some reason for discounting the evidence she rejects."

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714

F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may

---

[20]In contrast, the regulations governing applications filed before March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. §§ 404.1527, 416.927.

choose which evidence to credit and which evidence not to credit, so long as she does not

"reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554; see

also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.

1993)).

Here, following a narrative summary of the medical record and Plaintiff's

testimony and subjective complaints, tr. at 18-20, the ALJ addressed the medical opinion

evidence.  Id. at 20-23.  Regarding the opinions of the State agency medical consultants

Drs. Hollick and Brown – both of whom determined that Plaintiff retained the RFC to

perform sedentary work[21] and that she could perform her past relevant work as a

"telephone interviewer" – the ALJ found the opinions "somewhat persuasive," with

identical explanations:

> While [the consultant's opinion] is supported by citation to
> medical evidence and a narrative explanation, it is not entirely
> consistent with the objective findings of record, [Plaintiff's]
> treatment history, and her activities of daily living.  The
> undersigned finds the record supports a reduced light [RFC]

---

[21]Drs. Hollick and Brown both found Plaintiff capable of occasionally and
frequently lifting 10 pounds and standing or walking up to 2 hours in a workday.  Tr. at
62, 79, 97, 115.  These limitations are consistent with sedentary work, which involves
lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like
docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a).  Although a
sedentary job is defined as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties.  Id.  Jobs are sedentary if walking
and standing are required occasionally and other sedentary criteria are met.  Id.  Light
exertional work is defined as lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds.  Id. §§ 404.1567(b); 416.967(b).
Even though the weight lifted may be very little, a job is in this category when it requires
a good deal of walking or standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls.  Id.  To be considered capable of performing a
full or wide range of light work, a claimant must have the ability to do substantially all of
these activities.  Id.

> with postural limitations in addition to environmental
> limitations.  The undersigned also does not find that reduced
> stand and/or walk limitations are supported by the record,
> which shows [Plaintiff] has had generally unremarkable
> physical examination findings and her treatment providers
> indicated she does not need an assistive device to ambulate.
> Although [Plaintiff] does suffer from cardiac impairments,
> her condition has been improving and she has denied
> significant symptoms related to the same. . . .  In addition, the
> evidence does not show recent inpatient or even outpatient
> treatment with a cardiologist since March 2021.

Tr. at 20, 21.  Regarding the opinion of primary care physician Dr. Fan, the ALJ found

the doctor's opinion "generally not persuasive as it is not supported by [Plaintiff's]

examination findings and is not consistent with her treatment history," noting Plaintiff's

improvement and denial of significant symptoms, that she had no cardiologist treatment

since March 2021, and that she had received medical clearance for surgery.  Id. at 21-22.

The ALJ found Dr. Fan's opinion "persuasive" only to the extent that the doctor stated

that Plaintiff did not require an assistive device to ambulate.  Id. at 22.  Similarly, the

ALJ found the opinions of CRNPs Seitz and Pasierb to be "generally not persuasive" for

the same reasons as for Dr. Fan and the additional reason that CRNP Pasierb did not have

a long treatment history with Plaintiff, and "persuasive" only as to Plaintiff not requiring

an assistive device to ambulate.  Id. at 22-23.  Finally, the ALJ found the opinion of

gastroenterologist Dr. Morgan to be "somewhat persuasive" because it related to

Plaintiff's diagnosed acute blood loss anemia, for which she took an iron supplement, but

that "[t]he evidence does not support Dr. Morgan's opinion that [Plaintiff] . . . required

the option to sit/stand at will."  Id. at 23.

Plaintiff complains that the ALJ failed to provide a reasonable basis for discounting the opinions of the State agency consultants (Drs. Hollick and Brown) and Plaintiff's treating sources (Dr. Fan, Ms. Seitz, and Ms. Pasierb).  Doc. 10 at 8-11; Doc. 14 at 1-7.  First, Plaintiff argues that the ALJ's stated reasons for discounting each of the opinions, repeated five times, are generic and lack citation to specific evidence.  Doc. 10 at 8-19.  Although a review of the ALJ's opinion shows that the stated reasons are indeed repetitious and without record citation, remand would not be warranted solely on those grounds, in light of the Third Circuit's caution that ALJ opinions must be read as a whole.  See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  However, the ALJ's repeated reasons for discounting the opinions also contain important mischaracterizations.  For example, Plaintiff's cardiac treatment did not end in March 2021, as the ALJ implies.  Rather, the last treatment record from Plaintiff's cardiologist is dated April 20, 2021, id. at 1156-57, and when Plaintiff saw her primary care provider on July 9, 2021, she advised Plaintiff to promptly consult with her cardiologist in light of Plaintiff's "complex situation."  Id. at 1719.  Additionally, the ALJ repeatedly referred to Plaintiff receiving clearance for the gastrointestinal procedures, thus implying that Plaintiff's cardiac condition is not as limiting as Plaintiff alleges.  However, the record does not explain the implications of Plaintiff's bleeding or the possible consequences of not undergoing the procedures, nor is it clear that the procedures ever occurred.  Id. at 927, 1104.  Without such clarification, it is unclear what significance, if any, the medical clearance has in the context of evaluating the expert medical opinions.

20

More problematic is the ALJ's consistency analysis.  Although determining a claimant's RFC is the exclusive task of the ALJ, see Cleinow v. Berryhill, 311 F. Supp.3d 683, 685 n.11 (E.D. Pa. 2018) ("Surveying the medical evidence to craft an RFC is part of the ALJ's duties.") (quoting Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006)), here the ALJ determined that Plaintiff could perform a range of light work even though both consultants and every relevant medical treatment provider consistently limited Plaintiff to some range of sedentary work.  As the medical summary demonstrates, Plaintiff's primary care provider and cardiac treatment providers consistency opined that Plaintiff was limited to sedentary work, at best.  Although the ALJ found the opinions of the State agency consultants to be "somewhat persuasive," that persuasiveness related to Plaintiff's ability regarding postural and environmental limitations rather than her ability to stand/walk and lift/carry -- limitations which are more relevant to a cardiac impairment.  Additionally, although Plaintiff's gastroenterologist (Dr. Morgan) opined that Plaintiff could perform 8 hours of standing and walking in an 8-hour workday, Dr. Morgan's limitations related to a non-cardiac diagnosis (acute blood loss anemia) and do not reflect limitations attributable to Plaintiff's diagnosed congestive heart failure, coronary artery disease, and cardiomyopathy.  Even so, Dr. Morgan joined the other treatment providers in opining that Plaintiff required the ability to sit/stand at will, which the ALJ rejected.

The absence of medical opinion evidence to support the ALJ's RFC determination is not itself determinative.  See, e.g., Doty v. Colvin, Civ. No. 13-80, 2014 WL 29036, at *1 n.1 (W.D. Pa. Jan. 2, 2014) (the ALJ is not prohibited "from making an RFC

assessment even if no doctor has specifically made the same findings and even if the only

medical opinion in the record is to the contrary").  However, the significance of the

ALJ's flawed consistency analysis is underscored by the ALJ's reliance on the

improvement in Plaintiff's ejection fraction, from 20-25% in August 2020 to 35-40% in

February 2021.  Tr. at 455, 1072.  Plaintiff concedes that her ejection fraction improved,

but correctly notes that her ejection fraction remained abnormal according to her doctors.

Doc. 10 at 13.  More significantly, improvement in a condition does not mean that a

claimant is not disabled.  See Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000)

(opinion that claimant's condition was "stable and well controlled with medication" did

not support conclusion that claimant could return to work).  The key question is whether

a claimant's abilities remain limited with improvement in her medical condition.  Here,

Plaintiff's improved ejection fraction did not change any medical diagnoses or any

medical opinion regarding the significance of Plaintiff's cardiac impairments, and the

medical treatment providers consistently found Plaintiff's cardiac condition to be

"significant" and more limiting than found by the ALJ, including after the ejection

fraction improved.  See tr. at 1094-97 (Mar. 23, 2021 – Dr. Fan); 1139-42 (Apr. 21, 2021

– Ms. Seitz); 1189-92 (7/28/21 – Ms. Pasierb), 1629-32 (Aug. 19, 2021 – Dr. Fan).[22]

Moreover, although Plaintiff denied having symptoms in April and July 2021, see id. at

1158, 1720, her treatment providers maintained Plaintiff's diagnoses and treatment,

ordered repeat echos, and noted that her low blood pressure and injection fraction of less

---

[22]In addition, both State agency consultants (Drs. Hollick and Brown) were aware
of the improved ejection fraction results and nevertheless opined that Plaintiff had greater
stand/walk limitations than found by the ALJ.

22

than 40% equated to moderate to severe cardiac dysfunction.  Id. at 1157-58.  Taken together, this strongly suggests that the ALJ impermissibly substituted her interpretation of an improved ejection fraction over the opinions of the medical experts of record, which in turn resulted in a flawed RFC assessment.

Finally, the ALJ's flawed consistency analysis and RFC determination cannot be deemed harmless because if Plaintiff were limited to sedentary work, the VE testified that she could not perform her past relevant work.  Tr. at 49.  Therefore, the matter must be remanded for additional expert medical opinion regarding Plaintiff's cardiac-related limitations and, if deemed necessary, additional vocational testimony regarding what work, if any, Plaintiff is able to perform.

## IV.    **CONCLUSION**

The ALJ failed to provide a reasonable basis for discounting the opinions of both State agency consultants and Plaintiff's treating sources, and therefore the ALJ's RFC assessment and step four determination is not supported by substantial evidence.  On remand, the ALJ shall obtain additional expert medical opinion regarding Plaintiff's cardiac-related limitations, and additional VE testimony, if deemed necessary.

An appropriate Order follows.